FERRIS PRESS BRICK COMPANY v. L. C. THOMPSON ET AL.

Decided January 22, 1910.

**1.—Master and Servant—Brick Kiln—Negligence—Construction.**

In a suit for damages for the death of a brick burner caused by the negligent construction and decayed condition of a shed along a brick kiln which fell under the weight of the deceased, evidence considered and held sufficient to sustain a verdict against the owner of the kiln.

**2.—Same—Duty of Inspection.**

The fact that the decayed condition of a shed was not obvious or discoverable by a casual examination would not relieve the master from liability for damages resulting from its fall when a proper inspection would have revealed the decayed and unsafe condition of the same.

Appeal from the District Court of Ellis County. Tried below before Hon. F. L. Hawkins.

*G. C. Groce,* for appellant.

*W. M. Tidwell* and *Farrar, McRae & Kemble,* for appellees.

BOOKHOUT, Associate Justice.—This was an action in the District Court of Ellis County, Texas, by L. C. Thompson et al., widow and children of J. W. Thompson, deceased, against Ferris Press Brick Company for damages resulting from the death of said J. W. Thompson, who, on, to wit: September 15, 1907, received injuries at the plant of appellant resulting in his death. It was claimed on behalf of appellees, plaintiffs below, that the death of said J. W. Thompson was caused by actionable negligence on the part of appellant, of which he was an employe, in failing in various particulars alleged to furnish him a reasonably safe place to work, and in failing to properly construct, inspect and keep in reasonably safe condition a shed of one of its brick kilns, a portion of which fell resulting in injuries to said J. W. Thompson, which caused his death. The defendant below answered by exceptions, general and special, a general denial, and pleas of assumed risk and contributory negligence on the part of said J. W. Thompson. A trial at the September term, 1908, of the District Court of Ellis County, resulted in a verdict and judgment for plaintiffs below for $5,000, apportioned between them, and a new trial being refused this appeal was perfected.

*Conclusions of fact.*—J. W. Thompson, on the 15th day of September, 1907, was in the employ of appellant as a brick burner at its plant in Ellis County, Texas, on which day, while at work and within the scope of the duties of his employment, he sustained injuries resulting in his death. At the time of the injuries to Thompson appellant had seven kilns in operation at its plant in Ferris, Texas; Nos. 1, 2, 3, 4, 5, and 6 paralleled each other with about eighteen or twenty feet between each, and these kilns faced to the north. Kiln No. 7 was off by itself. A kiln has permanent walls of dry brick on the sides and ends, except that one end is open. It is about sixty-five feet long, twenty-five feet wide and eighteen feet high, and looks like a solid structure without windows; at the bottom of each side are "eyes," which are fifteen in number to the side, and are two brick wide and arched over, and extend out from the walls of the kiln about eighteen inches. Fuel is placed in these "eyes" for the purpose of burning the brick. The green brick are placed in the kiln in such manner that the heat can go through them. On top of the green brick at the top of the kiln is a layer of dry brick called a platten. A roof is constructed over each kiln as follows: Alongside

the kiln, every twelve feet, posts of six by eight stuff extend from the ground to above the top of the kiln. On top of these posts are plates of four by six timbers, and from these plates two by six rafters are attached, and upon which the roof is placed. The roofing is one by twelve boxing so arranged that half of it can be opened while a kiln is burning, to enable the heat and fumes to escape. The side sheds are constructed as follows: Near the top of the kiln a two by six stringer is fastened to the six by eight posts which support the roof of the kiln. This stringer runs all along the side of the kiln. Rafters run down from this two by six stringer, and a brace of two by six stuff comes up from the posts below and meets this rafter near the center of the space between the kilns, and the ends of the rafter and brace are sawed square. To this square end is nailed a two by six stringer from one to the other of said rafters and braces all the way down the center of the space between the kilns. On the top of this framework is nailed one by twelve boxing, and the outer or lower edge of the shed thus constructed is about eleven feet from the ground. There are no posts supporting the outer edge of the shed. The side sheds thus constructed from each kiln come about together in the center; in fact, the outer edge of the west shed of kiln No. 5 projects slightly over the outer edge of the east shed of kiln No. 6. There is also a shed similarly constructed running the entire north front of kilns 1 to 6, except that posts from the ground up support the outer edge of this shed. There are no posts supporting the outer edge of the side sheds, nor is there any sleeper between the outer sleeper of the side sheds and the sleeper near the top of the kiln above mentioned. In burning a brick kiln, the brick burner frequently has to go on top of the kiln and work the kiln, that is, to control the heat, causing it to go to different parts of the kiln. He does this by working the platten—the dry brick on top. He has a shovel, and when the heat has sufficiently burned a brick he tightens up the platten there and opens it at other places, and thus regulates the heat.

One witness testified: "This it hot work, and, besides the heat, gases escape from the burning kiln. The burner puts something under his shoes for their protection; we wear a piece of belt on our shoe soles to protect them from the heat. Sometimes a man can stay longer on top of a kiln than at others. I have gone on kilns and done all the necessary work to be done at that particular time before getting off, and again I have had to get off before finishing the work. Some kilns seem to have more fumes and gases or sulphur than others, and you can stay on a kiln longer sometimes than you can at other times. Usually one has to get off before finishing his necessary work, then go back and finish it. This is because of the heat and gas escaping through the top of the kiln. Generally, a brick burner, when he leaves the top of the kiln, gets off on a shed, that is, if he does not aim to go down to the ground. If he has not finished his work and just steps off to cool a little, he steps off on the shed. . . . When we got too warm on the top of the kiln and wanted to finish before we went down, we would just step off on a shed to cool. The foreman knew that the burners used the sheds for that purpose. On the sheds, about one-third of the way or a little more from the upper

edges, cleats of wood, just any kind of material that could be picked up, had been nailed along the sheds. I know that the burners used the sheds, as I have stated, for two or three years before Mr. Thompson was hurt. There was nothing else for a man to get out on when he got too warm and had to retire, except to go out on the front shed and down to the ground."

The injuries to Thompson from which his death resulted were caused by the falling of a portion of the shed attached to kiln No. 6, which gave way at or near its outer or lower edge, causing Thompson to fall to the ground. Thompson was at work on top of kiln No. 5, and the heat and fumes and gases becoming so great he stepped therefrom to avoid the same to the shed on kiln No. 6, which gave way and he was precipitated to the ground. That part of shed No. 6 which fell was in an unsafe condition, in that the braces, sleeper and framework of the shed had become decayed and rotten, and the nails with which the sleepers were fastened to the braces were rusted and rotten. This condition of the shed could have been discovered by inspection, and it was appellant's duty to inspect said shed, and its failure to do so and its failure to have the shed in a reasonably safe condition for a brick burner to retire upon, was negligence which proximately caused the injuries to said Thompson. The deceased Thompson was not guilty of negligence and did not assume the risk. By his death appellees have sustained damage in the amount of the verdict and judgment.

*Conclusions of law.*—It is contended that the trial court erred in refusing to instruct the jury peremptorily to return a verdict for defendant. As shown by our conclusions of facts, there was no error in this action. The evidence made a case of actionable negligence on the part of appellant and not purely an accident as is contended.

Nor does the evidence raise the issue that appellant had provided a safe way for brick burners to go from the shed of one kiln to that of another, and that Thompson, instead of adopting such safe way, took a dangerous way. The evidence showed that the employes had habitually used the sheds to retire upon from the gases and heat for two or three years, and that cleats of wood had been nailed thereon to keep them from slipping while so doing.

It is contended that the fact that the nails intended to hold the roofing plank to the sleeper that broke were rusted to the extent shown, and that one end of this sleeper was decayed about two of the nails in it, and that the sleeper was defective under the roofing planks, are all immaterial, since it was shown by production of the broken sleeper itself that neither of these conditions caused the break which began below the lowest nail on the defective end and split up obliquely to the top of the sleeper, and that there is nothing in the evidence to show that the master would have anticipated a break of this sleeper in this way. We do not agree to this contention. It was the duty of appellant to provide its employes a reasonably safe place to work. About two or three months prior to the injury to Thompson there had been some repairs put upon the shed of kiln No. 6, the shed which gave way. The workman who made the repairs

asked Nolen, the foreman, if he wanted him to go ahead with the repairing and get everything in good shape. Nolen replied, "No, just go ahead and do what has to be done at present." The witness Reeves testified that he "saw the broken down section of the shed where Thompson was injured the next day after the injury, and said that the outer sleeper was broken, was busted and split up and looked to be a little doty and the nails were kind of rusted out. It had become decayed some and split out and part of the crack looked like it was old and had become dry from the heat. The decayed and split part of the stringer was somewhere near the center of the piece at one end. That this shed was exposed to the weather, dust, smoke and gases which made the lumber look dark, dusty and smoky. That all the sheds had this appearance. That on account of the darkened condition of the lumber he did not think its soundness or unsoundness could be told by merely looking at it, nor could the rusted and decayed condition of the nails inside of the wood. A man on top of the shed could not see the stringer below except through the cracks of the roofing plank, and he supposed that a man walking on the ground below would be six or seven feet below this stringer, and he did not suppose that a man below, by merely looking up, could see the crack of which he spoke, without close inspection; he had never noticed it before."

McCarson, a witness for plaintiff, testified "that he was a carpenter and went to the place about twenty or twenty-five minutes after the injury to Thompson. That he noticed the conditions as they then were at the place of the accident. He found that the sleeper that had been broken had decayed some, and the nails were very rotten. Nearly everyone he looked at was about rotten in two. He could not say for sure whether one could have told this condition by merely looking at the sleeper, which was pretty badly smoked up; it was smoked pretty tolerably black. He could not tell the extent to which the sleeper was rotted, as he did not pay very close attention to it, just noticed it was rotten, but did not know to what extent. When two pieces of timber come together, and the joints are subject to the influence of the weather, rain, etc., they begin to rot at the joints most every time, and when one is laid on the other they are apt to begin to rot at the junction. One standing under the shed could not tell the condition of the lumber under the planks between it and the rafter without a close examination, but a critical examination would disclose the condition, and if such an examination had been made of the sleeper in question and its junction points with other timbers, it would have shown that a new piece of lumber should have been put in its place or that another piece of lumber should have been spliced on it; for instance, pieces of lumber four, five or six feet long could have been spliced over the joint to the sleepers, and have made the place safe. The condition that he saw showed that some repairs were required, whether to be made in the way indicated or not."

It may be true, and doubtless was, that one casually walking under the shed, it being eleven feet from the ground, or casually walking over the shed, would not discover the defects therein. But the evi-

dence was sufficient to justify the finding that a proper inspection of the shed would have disclosed the defects and the dangerous condition of the shed. The duty of inspection was on appellant. (Texas & P. Ry. Co. v. O'Fiel, 78 Texas, 486; Williams v. Hennefield, 57 Texas Civ. App., 54, 120 S. W., 567.) There was no duty of inspection upon Thompson. He could rely upon the presumption that the master had done his duty in this respect. The evidence did not show that the defect in the shed was obvious or that Thompson had notice of the same.

It is assigned as error that the court erred in paragraphs eight and nine of the charge in instructing the jury, in substance, "that if the side sheds of kilns five and six were furnished as places of retirement by brick burners in the course of their employment, or were permitted to be used by such burners as places of retirement in the course of their employment, that it was the duty of defendant to use ordinary care to make reasonable inspection of said sheds, and to maintain them in a reasonably safe condition for such purpose; and in submitting whether defendant failed to make a reasonable inspection of the shed that broke; and whether such failure, if such there was, was a proximate cause of the injuries to J. W. Thompson; because (1) there was no evidence that the shed of kiln No. 6, when that kiln was not in use, was furnished as or was knowingly permitted to be used as a place of retirement for brick burners when working on kiln No. 5, as J. W. Thompson evidently used such shed when he was injured; neither was there any evidence showing that the defendant should reasonably have anticipated that said Thompson would use said shed as he evidently did when he was injured; and (2) there was no evidence that the defendant had knowledge or notice of any fact that made it its duty, in the exercise of ordinary care, to inspect the shed which broke and the sleeper which broke with reference to the occurrence which caused the injuries to said Thompson and the causes thereof." This contention is not sustained. The evidence justified a charge on the duty of inspection of the shed, and the jury were justified in their finding that a proper inspection would have furnished knowledge of the defects therein.

No reversible error having been pointed out, the judgment is affirmed.

ON REHEARING.

The appellant, in its motion for rehearing, contends that we were in error in holding in our opinion that the evidence did not raise the issue that appellant had provided a safe way for its employes to go from the shed of one brick kiln to the shed of another, and that Thompson, the deceased, instead of using the safe way took another, which was dangerous, to his injury. There was evidence that planks had been placed on one side of roof No. 5 to the top of roof No. 6. It is not clear from the evidence that these planks were provided for the burners or used by them to retire upon. However, we find the trial court fairly and fully submitted to the jury the issue as to whether the appellant had provided a safe way for the burners to retire, and were told if it had and that Thompson, instead of taking

the safe way, chose the dangerous way and as a result was injured, then the jury were told he assumed the risk and they should find for defendant. The motion for rehearing is overruled.

*Affirmed.*

Writ of error refused